**NOT FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12536

_____

TERESA BOYD,

*Plaintiff-Appellant*,

*versus*

U.S. POSTMASTER GENERAL,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00234-AW-MAF

_____

Before WILLIAM PRYOR, Chief Judge, and LAGOA and KIDD, Circuit Judges.

PER CURIAM:

"Neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds."[1]  This unofficial motto captures the United States Postal Service's core function: the uninterrupted delivery of mail.  This appeal involves Appellant Teresa Boyd's admitted inability, at certain times following workplace injuries, to perform that function for the Postal Service.

After the Postal Service refused to assign Boyd to limited duty due to injuries from two workplace accidents, Boyd filed suit against Louis DeJoy, in his official capacity as United States Postmaster General, alleging race, sex, and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a(a); disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 794; and retaliation under Title VII, 42 U.S.C. § 2000e-16(a).  At summary judgment, the district court concluded that Boyd failed to present sufficient evidence to support any of her claims.

---

[1] United States Postal Service, Unofficial Motto, https://about.usps.com/who-we-are/postal-history/mission-motto.pdf (Oct. 1999).

After careful review of the record, and with the benefit of oral argument, we affirm the entry of summary judgment in favor of the U.S. Postmaster-General.  Boyd's race, sex, and age discrimination claims fail because the record contains no evidence that any protected characteristic played any role in the Postal Service's only challenged personnel action: its refusal to assign her to limited duty after her accidents.  Her disability discrimination claim fails because, although she had a disability, she never made a specific request for a reasonable accommodation and, in any event, could not perform an essential function of her position during flare-ups of her injuries.  And her retaliation claim fails because, despite alleging numerous workplace incidents, Boyd presented no evidence that any protected activity was known to the relevant decisionmakers at the time or that retaliation played any part in the challenged actions.

## I.      FACTUAL AND PROCUEDURAL BACKGROUND

Boyd is a Black female over the age of 60 who has been employed by the Postal Service since 1998.  At the time relevant here, Boyd was a full-time carrier technician at the Lake Jackson station in Tallahassee, Florida.  As a carrier technician, she organized the deliveries for her assigned routes and then drove a mail truck to deliver the mail and packages.  She also became a union shop steward in 2008 and union president in 2018.

Boyd twice suffered injuries in on-duty accidents involving her mail truck—neck and back strains in February 2015, and finger, wrist, and ulnar nerve injuries in October 2016.  She filed workers'

compensation claims based on both incidents.  After the second accident, the Postal Service said there were no assignments that fit within Boyd's medical restrictions, and she remained out of work until October 2017, when she "returned to full-time status with a 25-pound weight lifting restriction."

After a flare-up of her ulnar nerve injury in May 2019, Boyd was temporarily restricted from driving a mail truck by her doctor. By August 2019, however, it appears Boyd had been cleared to resume driving, except during "flare-ups" of her neck strain, during which her doctors advised that she would be unable to drive or complete her duties.

In August 2019, for example, Boyd submitted a Duty Status Report, or "CA-17" form that Boyd's doctor completed about her neck injury.  The form stated that Boyd "[w]ill require more time than usual to complete mail delivery route," and that she "[w]ill have occasional flare-ups of her neck problems such that she will not be able to turn her head [and] so will be unable to drive during the flare-ups," which "last a few days."  Boyd was also restricted to lifting no more than 15 pounds intermittently.  Her doctor included this same information in a short letter accompanying the CA-17 form.

In November 2019, January 2020, and February 2020, Boyd submitted additional CA-17 forms and letters about her neck injury.  They largely repeated the same instructions, apart from eventually raising her lifting restriction to 25 pounds.  The February 2020 CA-17 forms, for instance, said that, during a flare-up, Boyd

"will not be able to turn her head and she will not be able to drive during the time. Her flare-ups last a few days. She is unable to drive a postal vehicle." Her doctor otherwise indicated that Boyd could drive 4–6 hours per day, as required for her job, and could work eight-plus hours. According to Boyd, she experiences flare-ups about four times a year that last two to three days, and she is aware of the onset of a flare-up before beginning work for the day.

Boyd performed full-time limited duty work from May to October 2019. On October 22, 2019, however, supervisor Waylon Morrison ordered Boyd to go home, putting her on unpaid "emergency placement," after she submitted several requests for information as union representative. Boyd left as ordered but forgot her keys. When she reentered the building to get them, station manager Matthew Staley threatened to call the police. These events followed a similar incident on August 29, 2019, when Boyd was given a one-day emergency placement after submitting a request for information to Morrison. According to Boyd, the union contract stated that emergency placement was limited to three reasons: (a) causing injury to self or other; (b) being intoxicated on duty; and (c) for the safety of the Post Office.

On October 25, 2019, Boyd initiated an informal EEO complaint relating to the October 22 incident and emergency placement, alleging race, sex, age, and disability discrimination. Morrison was interviewed about the events approximately one month later.

Meanwhile, on October 26, 2019, Boyd returned to work, purportedly for a fact-finding process regarding the events on October 22. But Morrison refused to complete the fact-finding, and he instead informed Boyd that the Postal Service had no assignments that fell within her medical restrictions. Boyd asked to be allowed to return to her full-time job, but Morrison again said he had nothing within her medical restrictions.

On November 14, 2019, Boyd received notice that she would be suspended for two weeks for the October 22 incident. Morrison accused her of yelling at him on the workroom floor and acting aggressively in attempting to snatch the requests for information from his desk. Boyd filed grievances for both the emergency placement and the suspension, and both grievances were upheld, expunging all discipline for the alleged misconduct.

On February 11, 2020, Morrison offered Boyd a limited-duty assignment—casing mail for one of her previously assigned routes—for 1.5 hours per day. During that meeting, Boyd asked why he was offering her just 1.5 hours when "[she] could do [her] job." Morrison claimed it was the "only work they had available within [her] medical restrictions." Acting on the advice of her union, Boyd took the offer to preserve her employment.

Then, on May 15, 2020, supervisor Paul Steele confronted Boyd about where her car was parked. Boyd parked in the front parking lot reserved for Postal Service customers—instead of the employee lot—even though she had been parking there for 15 years without issue. Several days later, on May 21, acting station

manager Vanessa Cobb, against whom Boyd had previously lodged an EEOC charge, yelled and "scream[ed]" at Boyd that she needed to park in the employee parking lot and was not allowed to park out front. The next day, Cobb put Boyd on emergency placement. Boyd amended her October 2019 EEO filing to include these actions. Then, in July 2020, Boyd was served a notice of removal for the May 21 incident. Again, though, Boyd filed grievances for the action, resulting in the expungement of the information from her personnel file.

Boyd returned to her 1.5-hour limited-duty assignment in September 2020, but she was ordered to leave the station once her shift ended, and she was banned from entering any other post office in Tallahassee.

Later, in February and March 2021, Boyd received three letters from the Postal Service's District Reasonable Accommodation Committee, asking her to submit medical documentation and other forms reflecting her need for an accommodation. The Postal Service District Reasonable Accommodation Committee is the Postal Service's established means of determining reasonable accommodations. Although Boyd was familiar with the Committee for years before her accidents, she had never reached out to the Committee with her request for an accommodation. As noted, the Committee first contacted Boyd, and she ultimately declined to participate.

Boyd sued the U.S. Postmaster General in June 2021, asserting claims of discrimination based on race, sex, age, and disability,

and of retaliation for protected activity. *See* 42 U.S.C. § 2000e-16(a); 29 U.S.C. §§ 633a(a), 794. Following discovery, the Postal Service moved for summary judgment.

After a hearing on the motion, the district court granted summary judgment on Boyd's discrimination claims. The district court found no support in the record for Boyd's claims that her race, sex, or age played a role in the employment decisions she challenged. The district court concluded that her disability claim failed because the undisputed facts showed that Boyd could not drive a mail truck—an essential function of her position—when she had flareups of her neck and that Boyd failed to make a specific request for a reasonable accommodation for her flare-ups.

Regarding her retaliation claim, the district court ordered Boyd to file a notice that more clearly identified the adverse actions at issue and denied the Postal Service's motion without prejudice to renew. After Boyd filed the ordered notice, the Postal Service again moved for summary judgment. The district court granted the motion because the evidence failed to establish a causal connection between Boyd's protected activity and the alleged retaliation. Boyd now appeals.

## II.    STANDARD OF REVIEW

We review the grant of summary judgment *de novo*. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Summary judgment is appropriate when no genuine disputes exist as to any material fact, even when we view the evidence in the light most favorable to the non-movant. *Id.*; *see* Fed. R. Civ. P. 56(a). A genuine dispute

of material fact exists if a reasonable jury could return a verdict for the non-movant on the issue. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997). But "unsubstantiated assertions alone are not enough." *Anthony*, 69 F.4th at 804 (quotation marks omitted).

## III.    ANALYSIS

At the outset, we note that Boyd's presentation of the facts both at summary judgment and in her appellate briefing was difficult to discern. The challenge, as the district court observed, and as our own review confirms, is that Boyd never clearly identified which factual events correspond to which legal claims.

During oral argument, however, Boyd narrowed the scope of her discrimination claims, clarifying that her race, sex, age, and disability discrimination claims rested on a single adverse action: the Postal Service's refusal, from 2016 onward, to grant her a limited-duty assignment beyond the 1.5 hours of work per day she was permitted.

### A. Race, Sex, and Age Discrimination

To bring a claim under either Title VII or the federal-sector provision of the Age Discrimination in Employment Act, Boyd must prove that (1) her employer took a "personnel action[]" against her, 42 U.S.C. § 2000e-16(a), and (2) that "discrimination tainted the decision-making process." *Buckley v. Sec'y of Army*, 97

F.4th 784, 794 (11th Cir. 2024).[2]  Personnel actions must therefore be "untainted by any consideration of" the protected ground. *Babb v. Wilkie ("Babb I")*, 589 U.S. 399, 402 (2020).  If "discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination." *Babb v. Sec'y, Dep't of Veterans Affs.* ("*Babb II*"), 992 F.3d 1193, 1204 (11th Cir. 2021).

"[A] federal employer violates the law if it allows race [or other prohibited] discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in race discrimination." *Buckley*, 97 F.4th at 793; *see also Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1352 (11th Cir. 2024).  To show circumstantial evidence of discrimination, an employee may point to "suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn," "systematically better treatment of similarly situated employees," and evidence of pretext. *Lewis v. City of Union City (Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019).

In viewing the record, the district court determined that Boyd had shown no evidence "from which a jury could conclude that the [Postal Service's] refusal to provide a light-duty work

---

[2] "Because the relevant provisions of ADEA and Title VII are materially identical," we have interpreted them in parallel. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198–1200 & n.4 (11th Cir. 2021).

23-12536              Opinion of the Court              11

assignment . . . was based on Boyd's race, sex, or age." We agree with that conclusion. Even viewing the evidence submitted in the light most favorable to Boyd, a reasonable jury could not conclude that her race, sex, or age played a role in a personnel action against her. *See Babb II*, 992 F.3d at 1199.

Rather than identifying direct or circumstantial record evidence, Boyd merely asserts in conclusory terms that "younger, white employees and men have been assigned to full-time limited duty tasks," while Boyd has been refused the same assignment, and that younger, white, or male (or some combination of these characteristics) employees were otherwise treated more favorably than she was. These conclusory assertions are insufficient to create a genuine dispute of material fact to preclude summary judgment in favor of the Postal Service.

Although Boyd need not rely on the *McDonnell Douglas* burden-shifting framework[3] by pointing to comparators similar to her "in all material respects," *Lewis v. City of Union City (Lewis I)*, 918 F.3d 1213, 1227 (11th Cir. 2019) (en banc), Boyd failed at the summary judgment stage to develop any argument that a potential comparator was similarly situated to her, or even similar at all. Instead, Boyd simply relied on undeveloped assertions that others outside her class were treated better with no record evidence to support those assertions.

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The same is true on appeal. Boyd's speculative argument that several potential, unidentified comparators were given limited-duty assignments or generally treated more favorably does not, without more, show that the Postal Service's challenged actions were "tainted" by race, sex, or age discrimination. After all, we have no means of determining from these generalizations whether the Postal Service treated like employees differently because we have no way of assessing whether the alleged comparators were, in fact, like employees for purposes of performing a comparison.

In sum, Boyd presented only unsubstantiated assertions of race, sex, or age discrimination, which are insufficient to raise a genuine issue of material fact necessary to avoid summary judgment. *See Anthony*, 69 F.4th at 804; *Stewart*, 117 F.3d at 1284–85.

## B. Disability Discrimination

The Rehabilitation Act "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *see* 29 U.S.C. §§ 791, 794(a). Because the Rehabilitation Act adopts the standard for determining liability under the Americans with Disabilities Act ("ADA"), "cases involving the ADA are precedent for those involving the Rehabilitation Act." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1333–34 (11th Cir. 2022); *see* 29 U.S.C. § 794(d).

A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position." 42 U.S.C. § 12111(8). "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) (quotation marks omitted). Essential functions "do not include the marginal functions of the position." *Samson v. Federal Express Corp.*, 746 F.3d 1196, 1200 (11th Cir. 2014) (quotation marks omitted).

To make a "prima facie case of discrimination," Boyd must show that "(1) she had a disability; (2) she was otherwise qualified for the position; and (3) she was subjected to unlawful discrimination as the result of her disability." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007). To prove that she was "otherwise qualified for the position," Boyd must show that she "could perform the essential functions of the job with or without reasonable accommodations." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). An accommodation is reasonable "if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). Employees bear the burden of "identifying an accommodation and demonstrating that it is reasonable." *Id*.

There is no dispute that Boyd had a disability due to her two workplace vehicle accidents. The record reflects two limitations on Boyd's ability to perform her original job of carrier technician. First, she cannot lift more than 25 pounds. There is no dispute that

the lifting restriction can be and has been accommodated.  Second, Boyd is unable to turn her neck—and so cannot drive a postal vehicle—during a flare-up of her neck injury.  It is not disputed that driving a mail truck is an essential function of Boyd's position. Boyd testified that a flare-up occurs approximately four times per year and lasts for two to three days, and that she was aware of the onset of a flare-up before arriving for work.  Construing that testimony in her favor, Boyd would be unable to drive a vehicle for approximately eight to twelve days per year.

Boyd maintains that she could have performed the essential functions of her former position through the accommodations of using her leave or being reassigned during flare-ups.  The district court concluded that reassignment would not be a reasonable accommodation, because "an employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job," *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000), or to "create a permanent light-duty position," *Frazier-White*, 818 F.3d at 1256.  That is true.  But ultimately, the fatal flaw with Boyd's discrimination claim is that she cannot point to any evidence that she actually requested an accommodation from the Postal Service.

To trigger an employer's duty to provide a reasonable accommodation, an employee must make a "specific demand for an accommodation." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  That request must include a "demonstrat[ion] that such accommodation is reasonable." *Owens*, 52 F.4th at 1334.  And this demonstration requires an employee to

"identify her disability and suggest how the accommodation will overcome" it. *Id.* Although Boyd identified her disability and explained why it rendered her unable to do her job without accommodation, she did not make a "specific demand" for any accommodation. *Id.* Boyd's CA-17 forms did not propose that Boyd could take leave on days she could not drive. And although Boyd avers that she asked for a "reasonable accommodation" in person in October 2019 and February 2020, her request was limited to being able to "come back to work" rather than identifying a specific, reasonable accommodation.

Additionally, Boyd's late-requested accommodation would not allow her to perform the functions of her job. Boyd contends that the Postal Service could accommodate her by "allowing [her] to temporarily work in another role or use her leave during flare-ups." But moving her to another role would not "allow[] [Boyd] to perform the essential functions of the job." *Earl*, 207 F.3d at 1365.

We thus turn to Boyd's ability to take leave as a proposed reasonable accommodation. In support of her argument that leave is sufficient, Boyd tells us that between November 2017 and May 2019 she performed her full-time job with "use of her own leave time as an accommodation." But Boyd does not cite any record evidence for this fact. Neither Boyd's deposition nor her declaration discuss her use of leave during this period. Boyd's deposition, in fact, suggests that her neck and back troubles did not require her to avoid driving on certain days during that period. And when she

had to stop driving in May 2019, it was because of her hand injury, not her neck or back. The record evidence neither establishes her leave practices nor tells us how many days of leave she had per year. Further, the lack of record evidence makes it impossible to determine whether Boyd's leave requests would amount to periodic absences or whether she would regularly require someone else to perform the "essential functions of [her] job," rendering her no longer qualified for her position. *Cramer v. State of Fla.*, 117 F.3d 1258, 1264 (11th Cir. 1997).

Because Boyd fails to meet her "burden of persuasion" that a reasonable accommodation exists, *Earl*, 207 F.3d at 1367, much less that she requested one in the first place, we affirm the district court's judgment on Boyd's claim for disability discrimination.

## C. Retaliation

Title VII protects federal employees from retaliation. *Babb II*, 992 F.3d at 1203. "Because we've said retaliation falls within the category [of] 'discrimination' under § 2000e-16(a), that means that '[a]ll personnel actions' must be made 'free from any' retaliation." *Buckley*, 97 F.4th at 798. So "if retaliation for engaging in a protected activity under Title VII taints the decision-making process for any personnel action, that violates the federal-sector provision—even if the employer would have made the same decision absent retaliation." *Id.*

One way to establish a Title VII public-sector retaliation claim is by establishing a prima facie case of retaliation under the

*McDonnell Douglas* framework. *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 876 (11th Cir. 2025). An employee must show that (1) she engaged in protected activity (by, for example, initiating an EEOC complaint); (2) she suffered an adverse action; and (3) a causal link exists between the protected activity and the adverse action. *Id.* The causal relationship element can be met with evidence that would allow a reasonable jury to find that retaliation "play[ed] any part" in the employer's decisionmaking process. *Buckley*, 97 F.4th at 798; *see also Rosado*, 127 F.4th at 876. That requires proof "that the relevant decisionmaker was aware of the protected conduct." *Patterson v. Ga. Pacific, LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022).

Causation can be established by showing close temporal proximity between the protected activity and the employment action at issue, "[b]ut mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quotation marks omitted) (in the context of a but-for inquiry, holding that a period of three to four months, without more, was too long to establish an inference of causation); *see Buckley*, 97 F.4th at 798–99 (in a federal sector case, holding that a period of seven to eight months was too long to establish an inference of causation). "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas*, 506 F.3d at 1364.

Here, we conclude that the district court did not err by granting the Postal Service's motion for summary judgment on Boyd's retaliation claim. *See Anthony*, 69 F.4th at 804. Boyd failed to sufficiently establish causation between any of her protected activities and the allegedly retaliatory personnel actions. Nor did Boyd point to other evidence that retaliation "played any part" in the Postal Service's decisions.

The events leading to Boyd's emergency placement on October 22, 2019, and Staley's associated threat to call the police, predated Boyd's October 25, 2019, initial EEO contact, so they could not have been in response or reaction to it. *See Thomas*, 506 F.3d at 1364. Although the October 26, 2019, incident and her November 14, 2019, suspension closely followed that initial EEO contact, Boyd failed to show that Morrison, the relevant decisionmaker, was aware of that activity at the time. *See Patterson*, 38 F.4th at 1351. Morrison denied having knowledge, and it appears his EEO interview did not occur until November 25, 2019, i.e., after the events at issue.

Nor does the record support a reasonable inference of causation between Boyd's protected activity and the remaining actions at issue. The February 11, 2020, modified job offer occurred more than three months after Boyd's October 25, 2019, initial EEO contact, and predated her February 14, 2020, EEO contact. Similarly, the May 15 and 21, 2020, incidents happened three months after Boyd's February 14, 2020, EEO contact. And the same is true of

Boyd's May 22, 2020, emergency-placement assignment.[4] Without more, these three-month (or longer) periods are insufficient to reasonably infer a causal connection. *See Thomas*, 506 F.3d at 1364.

Although it appears Boyd amended her EEO complaint to include the May 2020 incidents before she was served a notice of removal on July 8, 2020, nothing suggests that the relevant decisionmakers were aware of that protected conduct. *See Patterson*, 38 F.4th at 1351. Boyd also claims that she was denied entry to other stations for union matters and ordered to leave the Lake Jackson station as soon as her shift ended. But again, the record lacks evidence that the relevant decisionmakers knew of her EEO activity at the time. *See id.* In sum, Boyd did not present enough evidence to show that retaliation played a part in any of the personnel actions she identified. *See Buckley*, 97 F.4th at 798–99.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's summary judgment orders entered in favor of the U.S. Postmaster-General.

**AFFIRMED.**

---

[4] The evidence that Boyd submitted that some supervisors voiced their support of the notice of removal does not show that the notice was issued retaliatorily.